***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Donovan with minor modifications and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. The parties are subject to the N.C. Workers' Compensation Act and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. An employee-employer relationship existed between plaintiff and defendant-employer.
3. The carrier liable on the risk is correctly named above.
4. Plaintiff's average weekly wage is $1,368.85, resulting in the maximum compensation rate for 2007 in the amount of $754.00.
5. Plaintiff sustained an injury to her spine on or about June 29, 2007.
6. The injury arose out of and in the course of employment and is compensable.
7. The parties participated in a mediated settlement conference on 18 August 2008, and defendants have paid the entire mediation fee in the amount of $825.00. Pursuant to Rule 7(c) of the Rules for Mediated Settlement and Neutral Evaluation Conferences of the North Carolina Industrial Commission, defendants are entitled to a credit in the amount of $412.50 for payment of plaintiff's share of the mediation costs.
 *********** ISSUES
1. Whether plaintiff's position with defendant-employer constitutes suitable employment?
2. Whether plaintiff is entitled to temporary partial disability benefits?
3. Whether plaintiff's right hip injury is causally related to her compensable injury and if so, whether plaintiff is entitled to have medical bills related to the right hip treatment paid for by defendants?
 *********** *Page 3 EXHIBITS
1. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: I.C. Forms
 b. Stipulated Exhibit #2: Pay stubs
 c. Stipulated Exhibit #3: Medical records
 d. Stipulated Exhibit #4: Discovery responses
 e. Stipulated Exhibit #5: Voc rehab report (submitted post-hearing)
2. In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence:
 a. Defendants' Exhibit #1: Discovery responses
 b. Defendants' Exhibit #2: Job description
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 60 years old. She has an associate's degree in nursing and has a vocational history of nursing positions and data entry. Plaintiff worked as a nurse for defendant-employer. Previously, plaintiff has worked as a nurse's aide for a variety of facilities since 1968. She owned her own retirement home for seven years before working as a certified nurse's assistant at UNC hospital. She next worked as an office assistant with the nursing faculty at Alamance College, a position which involved clerical and computer skills. She was eventually hired by defendant-employer on 30 August 1995. Since being hired by defendant-employer, plaintiff has also worked intermittently *Page 4 
for a dentist's office in Fayetteville, North Carolina, working approximately 19 hours per week earning $12.00 per hour. At hearing, plaintiff testified that she has been offered this job as a full-time position.
2. At the time of the hearing before the deputy commissioner, plaintiff was employed by defendant-employer within her restrictions primarily as a data entry clerk with some additional nursing tasks. Plaintiff is restricted to working 32 hours per week. Her duties include printing monthly nurse medication sheets (MAR's), nurse treatment sheets (TAR's), and physician orders, input of incident reports, giving injections, documenting in charts, making phone calls to families, receiving consents from families, completing the monthly changeover, editing physician's orders, auditing the physician's orders and reconciling these against the current month to the next month.
3. On 29 June 2007, plaintiff was lifting a patient off of the floor when she felt a sudden onset of pain in her lower back. Defendants accepted this injury as compensable. Plaintiff has also alleged an injury to her right hip as a result of this accident. Defendants have denied the compensability of plaintiff's right hip injury claim.
4. On 6 July 2007, plaintiff presented to her primary care physician, Dr. James G. Wallace, Jr. a second year resident at UNC Family Medicine. Plaintiff gave a history of low back pain and right hip pain beginning approximately one week earlier. She also reported a history of obesity and osteoarthritis. Upon examination, plaintiff was tender in her sciatica region, her paraspinal muscle, and around her spine at L3, L4, and L5. Dr. Wallace diagnosed plaintiff with low back pain and sciatica. He prescribed pain medication and physical therapy, and plaintiff was advised to return for follow-up care in one week. *Page 5 
5. Plaintiff gave her employer a note with her restrictions and was directed by defendants to present to Dr. Jennifer Swanson at Concentra Medical Centers on 9 July 2007. Dr. Swanson had treated plaintiff for a prior back injury to her lumbar region in May of 2006. Plaintiff presented with complaints of pain in her lower back and right hip. Upon examination, Dr. Swanson found that plaintiff was tender over her right hip and lower lumbar area. Dr. Swanson ordered x-rays of both areas, which revealed mild degenerative changes at L5-S1 and significant degenerative joint disease with loss of joint space in the right hip. Dr. Swanson diagnosed plaintiff with a lumbar strain and right hip pain.
6. Dr. Swanson opined that plaintiff's hip pain was not causally related to the 29 June 2007 accident but was the result of her arthritic condition. Dr. Swanson diagnosed plaintiff with a lumbar strain and right hip pain. Restrictions were assigned of no lifting greater than 10 pounds, no pushing or pulling greater than 20 pounds, no bending, squatting or kneeling and sitting as needed. Dr. Swanson told plaintiff to begin physical therapy three times a week for three weeks, and to follow up in two days. As Dr. Swanson did not relate plaintiff's hip condition to the compensable work-related injury, she referred plaintiff to her primary care physician or orthopedist for treatment of her hip.
7. On 13 July 2007, plaintiff returned to UNC Family Medicine with complaints of "low back pain, right leg pain." Dr. Wallace's treatment records reflect that plaintiff complained of back pain radiating down her thigh and into her leg. There is no mention of right hip problems in the treatment records. Dr. Wallace ordered x-rays, which revealed degenerative disc disease and anterior angulation of the lower sacrum, osteophytosis of the SI joints bilaterally and diminished joint space consistent with osteoarthritis. Dr. Wallace opined that plaintiff had "lumbar and right sacral radiculopathy," but did not diagnose the right hip condition. Dr. Wallace *Page 6 
refilled plaintiff's pain medications, continued her physical therapy treatments, and wrote her out of work until 20 July 2007. Additionally, Dr. Wallace referred Plaintiff to UNC Orthopedics for further treatment for her continued "SI joint injection/sciatica" without any mention of ongoing hip pain.
8. On 2 August 2007, Dr. Wallace noted that plaintiff was making progress with physical therapy and recommended she continue with the regimen for four more weeks. Dr. Wallace diagnosed plaintiff with back and leg pain at this time as well, and kept her out of work for an additional week. Thereafter, he returned her to work on a modified schedule for three weeks. Plaintiff returned to work for defendant-employer at this time in the data entry position which was within her restrictions.
9. Plaintiff returned to Dr. Swanson's office on 8 August 2007 for treatment of her lumbar strain. Following an examination, Dr. Swanson reiterated her diagnosis of a lumbar strain, for which she prescribed additional physical therapy. She issued modified work restrictions of no lifting over ten pounds, no bending, and no pushing or pulling over 20 pounds.
10. Plaintiff returned Dr. Swanson's office for further treatment of her low back pain on 14 August 2007 and 21 August 2007. At the 21 August 2007 appointment, Dr. Swanson re-examined plaintiff's hip, which exhibited no tenderness and normal range of motion. Dr. Swanson has not examined plaintiff since this date.
11. Given the degree of arthritic changes in plaintiff's right hip and that plaintiff's complaints of pain were concentrated in the joint rather than in the muscle, Dr. Swanson opined that plaintiff's hip condition was not causally related to the 29 June 2007 accident. Dr. Swanson further opined that the 29 June 2007 incident did not materially aggravate plaintiff's pre-existing *Page 7 
degenerative joint disease. Dr. Swanson specifically opined that she did not interpret her findings to indicate that the 29 June 2007 accident brought about pain in plaintiff's right hip.
12. Dr. Wallace opined that plaintiff's right hip pain in July 2007 was caused by the 29 June 2007 accident. He testified that this opinion was based in part on plaintiff's report of having no back or hip pain prior to the 29 June 2007 accident.
13. Given the greater experience of Dr. Swanson, her prior treatment of plaintiff for earlier back problems, and her technical explanation of the separation of the two conditions suffered by plaintiff, the undersigned give greater weight to Dr. Swanson's opinion regarding the relationship between plaintiff's hip condition and the compensable injury of 29 June 2007, over that of Dr. Wallace, whose diagnosis was based primarily upon his reliance on the premise that plaintiff was not hurting prior to the date of injury so it must be causally related.
14. On 21 September 2007, plaintiff underwent an MRI of the lumbar spine at Burlington Imaging and Breast Center, revealing multilevel degenerative change of the posterior elements and disc narrowing at T12-L1 and L1-2. It was recommended that Plaintiff continue seeing her chiropractor and continue her home exercises.
15. Pursuant to Dr. Wallace's referral, plaintiff presented to Triangle Orthopaedic Associates on 13 September 2007 and was examined by Dr. Andrew Lynch. Plaintiff's chief complaint was low back pain. At that time, plaintiff's right hip was no longer hurting her, and she did not seek treatment for right hip pain. Plaintiff reported that she was currently working and that she wished to work for an additional three years before retiring. Following an examination, Dr. Lynch diagnosed plaintiff with subacute low back pain related to a work-related injury, right hip degenerative joint disease, the symptoms of which had resolved, and *Page 8 
morbid obesity. Dr. Lynch renewed the work restrictions prescribed by Dr. Swanson and advised plaintiff to return in one week.
16. On 20 December 2007, plaintiff returned to Dr. Lynch's office after having two sets of diagnostic medial branch blockades for her low back problems on 7 November 2007 and 12 December 2007. Plaintiff experienced significant improvement following these procedures. Following an examination, Dr. Lynch placed plaintiff at maximum medical improvement and assigned permanent work restrictions of no pushing or pulling over 20 pounds, no bending, squatting, stooping, twisting, crouching, kneeling, crawling or climbing, occasional standing, and frequent walking.
17. Plaintiff returned to Triangle Orthopedics for intermittent treatment of her low back pain, but was never treated for right hip pain. On 25 July 2008, plaintiff's care was transferred to Dr. Eugenia F. Zimmerman. Dr. Zimmerman has continued treating plaintiff for low back pain, but has never treated her for right hip pain.
18. In October 2008, plaintiff experienced a flare-up of her back pain. On 7 November 2008, Dr. Zimmerman assigned work restrictions reducing plaintiff's hours to 32 hours per week. Subsequently, on 5 December 2008, Dr. Zimmerman revised plaintiff's restrictions to increase her lifting capacity, which resulted in permanent restrictions of working no more than 32 hours per week, no lifting over 20 pounds, alternating between standing and sitting, and no walking over 100 feet. Dr. Zimmerman opined that plaintiff is capable of working the data entry position within these restrictions indefinitely.
19. When plaintiff's working hours were limited to 32 hours per week by Dr. Zimmerman, plaintiff ceased performing the nursing portion of her original return to work duties and concentrated on the data processing. *Page 9 
20. Mr. John McGregor was retained as the vocational rehabilitation specialist in this matter. He prepared an initial report on 10 November 2008. In preparation for this report, Mr. McGregor met with plaintiff and representatives of defendant-employer, toured defendant-employer's health facility and observed plaintiff performing her modified duties. At that time of the observation, plaintiff was still performing a combination of duties from her pre-injury job as a nurse and the data entry position. As a result, Mr. McGregor was under the impression that the data entry position was a job created especially for plaintiff, which did not exist prior to her injury. Accordingly, Mr. McGregor found that plaintiff's job was not "suitable" employment as defined by the Act. He based this opinion on (1) that plaintiff was earning her pre-injury wage of $25.73 per hour, which was significantly higher than the average salary of a data entry clerk of $15.00 per hour; (2) that the position was a combination of two jobs; and (3) that the position was not available in the competitive labor market.
21. Mr. McGregor attended the 13 November 2008 hearing, and after listening to plaintiff's testimony regarding her current work status determined to revisit his earlier opinion. Mr. McGregor returned to defendant-employer's facility on 23 February 2009, and once again observed plaintiff performing her work duties. He was informed that plaintiff was no longer performing the nursing duties and that the data entry position was in fact a necessary job at defendant-employer's facility which defendant-employer would have to fill if plaintiff was not available to work. Based on this information, Mr. McGregor found plaintiff's current position as a data entry clerk to be suitable employment as defined by the Act and specifically that it did not constitute a "make work" position.
22. Mr. McGregor based his change in opinion on the fact that the position was an established one at defendant-employer's facility and that plaintiff was no longer performing a *Page 10 
combination of duties, but strictly those of a data entry clerk. Although plaintiff earns more than the average data entry clerk, Mr. McGregor assigned less weight to this factor because he assumed she would have received promotions and pay increases if she began in this position when starting work for defendant-employer 15 years ago. Furthermore, he noted that plaintiff was able to input additional information because of her nursing background, which the average data entry clerk does not possess. Finally, Mr. McGregor compared her current opportunity for advancement with her desire to continue working for only two more years before retirement. Since plaintiff had indicated that she intends to retire at 62 years old and move to Arkansas, Mr. McGregor found it less important as to whether she would receive promotions in the long-term.
23. Mr. McGregor also opined that there are jobs available within the competitive labor market suitable for plaintiff's age, education, work experience, and physical restrictions. Specifically, Mr. McGregor identified five categories of jobs that were suitable for plaintiff, including patient appointment clerk, dental office receptionist, data entry operator, nurse case manager, triage nurse, health educator and vocational training (CNA) instructor. With the exception of triage nurse, Mr. McGregor found job openings in theses areas within plaintiff's geographical region. Based on these findings, Mr. McGregor opined that plaintiff would be able to find suitable employment within the competitive labor market if she stopped working for defendant-employer. Further, Mr. McGregor opined that plaintiff has the capacity to earn her pre-injury wages in the competitive labor market if she chose to pursue other employment.
24. Beginning around December 2008, plaintiff began having trouble performing her job as a data entry clerk. Ms. Allison testified that plaintiff initially showed difficulty in making timely changes to some patient charts. In January, February, and March 2009, Ms. Allison began noticing plaintiff committing more errors in her data entry. During the first part of March 2009, *Page 11 
plaintiff was written out of work for health reasons unrelated to this matter. Ms. Allison and another co-worker assumed her responsibilities of data entry, which gave Ms. Allison greater opportunity to review plaintiff's work product. After discovering a number of errors which Ms. Allison opined posed health and safety risks to the patients receiving treatment at defendant-employer's facility, plaintiff was suspended indefinitely as of 26 March 2009, while an investigation into the cause of the errors could be performed.
25. While defendant-employer has offered a number of errors which they claim are attributable to plaintiff, plaintiff has offered an equal number of explanations for those errors or attributed them to someone else. In the end, there is no evidence that plaintiff's suspension was the result of her compensable injury by accident. It is noted that the investigation is ongoing and plaintiff has not been terminated from her position; however, regardless of how it may resolve, the issues raised by the parties are in the nature of whether the suspension was reasonable as an employment practice. The undersigned do not have jurisdiction to review this issue.
26. As it pertains to whether plaintiff's suspension was pretextual such as to provide an entitlement to benefits, the undersigned find that plaintiff's suspension would have occurred to any employee with the same allegations of error and it is not related to her compensable injury by accident.
27. Since her suspension, plaintiff has undertaken to search for new employment based on her attorney's advice. Plaintiff has applied for unemployment benefits, and she has registered with the Employment Security Commission to search its job postings. Plaintiff has applied for a total of six positions since being suspended in on 26 March 2009, but she has not received any job offers to date. *Page 12 
28. The undersigned find that plaintiff suffered a specific traumatic incident of the work assigned on 29 June 2007 and as a result missed some work and required medical treatment. The undersigned further find that based upon the greater weight of the expert medical testimony, plaintiff's hip condition is arthritic, non-disabling and unrelated to the 29 June 2007 incident.
29. The data entry position performed by plaintiff is not make work and constitutes suitable employment as defined by the Workers' Compensation Act. Further, plaintiff's performance of the position is indicative of an ability to perform this and other jobs within her restrictions. The greater weight of the vocational evidence shows that there are suitable jobs within plaintiff's restrictions, geographical area, and pay history which plaintiff is capable of obtaining.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by specific traumatic incident of the work assigned on 29 June 2007, resulting in an injury to her lower back. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, subject to the statute of limitations prescribed in N.C. Gen. Stat. § 97-25.1. N.C. Gen. Stat. §§ 97-25; 97-2(19). *Page 13 
3. Plaintiff's hip condition has not been shown to be causally connected to the compensable injury, and plaintiff is not entitled to indemnity or medical benefits as a result of that condition. N.C. Gen. Stat. § 97-2(6).
4. An injured employee shall not be entitled to compensation if he unjustifiably refuses suitable employment procured for him suitable to his capacity. N.C. Gen. Stat. § 97-32. Suitable employment is defined as any job that a claimant is capable of performing considering his age, education, physical limitations, vocational skills and experience. Munns v. Precision Franchising,Inc., ____ N.C. App. ___, 674 S.E.2d 430 (2009). The greater weight of the credible evidence shows that plaintiff's position as a data entry clerk for defendant-employer is suitable employment and is not make work. Id.; Jenkins v. Easco Aluminum,165 N.C. App. 86, 95, 598 S.E.2d 252, 258 (2004).
5. Where a claimant is terminated from employment for misconduct or other fault on the part of the employee, the employee may be deemed to have constructively refused suitable employment and therefore is barred from receiving benefits. Seagraves v. AustinCo. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996). Under Seagraves, to bar payment of benefits, an employer must demonstrate initially that: (1) the employee was terminated for misconduct; (2) the same misconduct would have resulted in the termination of a nondisabled employee; and (3) the termination was unrelated to the employee's compensable injury. Id.
6. In the case sub judice, plaintiff's suspension from employment with defendant-employer is attributable to plaintiff's alleged poor work performance which is unrelated to the compensable injury and for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's suspension constitutes a constructive refusal to perform the work provided. Id. *Page 14 
7. Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that her inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Id.
8. In the case at bar the greater weight of the evidence shows that after her suspension plaintiff was capable of some work and that there are viable opportunities of employment for plaintiff that are within her permanent restrictions, her demonstrated earning power, and her geographical area. Demery v. Perdue Farms,Inc., 142 N.C. App. 259, 545 S.E.2d 485 (2001). Therefore, after plaintiff's suspension, plaintiff failed to prove that she was disabled from employment due to the compensable injury and is not entitled to further compensation. N.C. Gen. Stat. § 97-29;Seagraves v. Austin Co. of Greensboro, supra.
9. Plaintiff is not entitled to further indemnity compensation for the injury sustained on 29 June 2007. N.C. Gen. Stat. § 97-29.
 ***********
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission makes the following award:
 AWARD
1. Defendants shall pay medical expenses incurred or to be incurred related to the compensable back injury of 29 June 2007, when medical bills have been submitted according to established Industrial Commission procedures.
2. Plaintiff's claim for further indemnity benefits is hereby DENIED.
3. Plaintiff's claim for medical treatment for her hip condition is hereby DENIED.
4. Each party shall bear its own costs. *Page 15 
This the 11th day of March 2010.
 S/___________________
 STACI T. MEYER
 COMMISSIONER
CONCURRING:
S/___________________ PAMELA T. YOUNG CHAIR
S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1